# THOMAS TONGUE *vs.* NEGROES CRISSY, RHODY and others.

The restrictions in the act of 1796, ch. 67, as to *the age* at which slaves may be manumitted, are *repealed* by the act of 1831, ch. 281, and since the pas-

sage of the latter act, any slaveholder may manumit his slave of *whatever age*, and if the slave be unable to maintain himself, and does not remove out of the State, the manumittor or his representatives are liable for his support.

No *consent* to the gift of freedom on the part of the manumitted slave is necessary: the *consent* mentioned in the third section of the act of 1831, ch. 281, refers to removal from the State, and not to manumission.

This law *presumes* that as freedom is a most precious legacy, those on whom it is cast do accept it, and has provided a mode how their dissent, whenever it exists, shall be evidenced, by requiring it to be done in *open court*.

Declarations of negroes petitioning for freedom, made *after* their petition was filed, that they never authorized the filing of it, are not admissible in evidence upon the trial before the jury of the issue of freedom *vel non*.

APPEAL from the Circuit Court for Anne Arundel county.

*Petition for freedom* by the appellees, who claimed their freedom under the following clause of the will of John Collinson, executed on the 24th of September 1836.

"*Item.* I will and devise that all my negroes, of which I shall die possessed, shall be free from the servitude of all persons whatever, from and after my decease: *provided* that they, my said negroes, shall go to Liberia, or some one or other of the American settlements on the coast of Africa. But should they refuse to go to either of the settlements in Africa aforesaid, then and in that case I will and bequeath them as follows." Then follow bequests of his negroes to legatees under whom the appellant claimed.

*1st Exception.* The petitioners offered in evidence the above will and the following written agreement, signed by the counsel for the respective parties: "In this cause it is agreed that the petitioners, Crissy and Rhody, were, at the time of the death of John Collinson, their master, of the ages respectively of six and four years. It is admitted, on the other side, that the petitioners, Crissy and Rhody, were the slaves of John Collinson at the time of his death, and were embraced in the clause of manumission contained in the will of said Collinson, and that the other petitioners are the children of said Rhody and Crissy, born since the death of said Collinson; and it is further admitted, that the personal estate of the said Collin-

son, other than his manumitted negroes, was more than sufficient to pay his debts, and that he left no widow." The petitioners here rested their case.

The defendant then proved by Alexander Franklin, a competent witness, that the petitioners, Rhody and Crissy, were not, at the time of the death of said Collinson, able to work and gain a sufficient maintenance and livelihood, and that he had divided the negroes of said Collinson between the heirs of Thomas Tongue, and that said Rhody and Crissy were assigned to Mrs. Harriet Waters, as part of her share thereof. Upon cross-examination witness stated, that to the *best of his judgment* said Crissy and Rhody were incapable of supporting themselves. The defendant then further offered his brother, Benjamin Tongue, as a witness to support the issues on his part. The petitioners objected to his competency, and for the purpose of sustaining their objection, proved by him that he was the executor of Mrs. Harriet Waters, and that she, by her will, after bequeathing two of her negroes to the sister of the witness, had bequeathed the rest of her slaves, including the petitioners, to be divided equally in value between the witness and his brother, the defendant, and that in the division of said negroes the petitioners were assigned, with other negroes, slaves for life, belonging to her, to the defendant; and other of the negroes, all slaves for life, were assigned to the witness as his share thereof. The petitioners thereupon, by their counsel, insisted said witness was an incompetent witness, because of his interest in the event of this suit. Which objection the court (BREWER, J.,) sustained, and excluded the evidence from the jury. To this ruling the defendant excepted.

*2nd Exception.* The petitioner then further offered to prove by said Benjamin Tongue, which of the children mentioned in the petition were the children of Rhody, and which were the children of Crissy, and that said petitioners had never authorized the filing of this petition in their name, but that the proceeding was instituted by the direction of George W. Nutwell, without their knowledge or consent, and contrary to

Tongue *vs.* Negroes Crissy, Rhody, *et al.*

their wishes. The petitioners again objected to the compe-
tency of this witness upon the same ground as in the first ex-
ception, and this objection the court again sustained, and the
defendant excepted.

*3rd Exception.* The defendant then offered to prove, by
Alexander Franklin, that the petitioners, Rhody and Crissy,
were, at the death of said John Collinson, by reason of their
mental imbecility arising from their tender years, incapable of
consenting to their manumission by the will of said Collinson.
The petitioners objected to the admissibility of this evidence,
which objection the court sustained, and the defendant ex-
cepted.

*4th Exception.* The defendant then offered to prove that the
petitioners, Rhody and Crissy, were the children of Nelly
Hutton, (a negro slave for life of said Collinson at the time of
his death, and one of the negroes manumitted by his will,)
and born before the death of said Collinson, and then offered
to read in evidence certain proceedings in the Orphans Court
of Anne Arundel county, showing that on the 21st of March,
1837, said negro Nelly Hutton and another, two slaves of
said Collinson, appeared in open court, "and after an expla-
nation made to them, made their election to remain in the
State and serve the family of Thomas Tongue in preference
to emigrating to Liberia. The woman Nelly appears to be
about twenty-three years of age, and says she has a husband
a slave of Gideon G. Tongue, and has four children." To
the admissibility of all this evidence the petitioners objected,
which objection the court sustained, and the defendant ex-
cepted.

*5th Exception.* The defendant then, in connection with the
evidence in the preceding exception, offered to prove by Ed-
ward Gott, a competent witness, that he knew the petitioners,
Rhody and Crissy, and that since the filing of their petition
they had said that they never authorized the filing of it, and
did not consent to be manumitted. To the admissibility of
this evidence the petitioners objected, which objection the
court sustained, and the defendant excepted.

*6th Exception.* The petitioners then prayed the court to instruct the jury, that if they find the execution of the will of John Collinson offered in evidence, and the facts set forth in the written agreement mentioned in the first exception, they must find for the petitioners. This prayer the court granted, and the defendant excepted.

*7th. Exception.* The defendant then offered a prayer, that if the jury shall find from the evidence that the petitioners, Rhody and Crissy, were, at the death of the said John Collinson, unable to work and gain a sufficient maintenance and livelihood, then they must find their verdict for the defendant. This prayer the court refused, and the defendant excepted, and the verdict and judgment being in favor of the petitioners, appealed.

The cause was argued before LE GRAND, C. J., TUCK and MASON, J.

*Wm. G. H. Dorsey* and *Thos. G. Pratt* for the appellant, argued, upon the 1st and 2nd exceptions, that the court erred in excluding the testimony therein proposed to be offered:

1st. Because the witness had no such interest in the event of the suit as would render him incompetent; that the verdict and judgment could only be offered in evidence against the subsequent claim of the defendant, and would not be evidence against strangers to that proceeding; that the witness, if such verdict and judgment would be evidence against him, would not be bound to contribute to the defendant. 3 *Term Rep.*, 27, *Bent vs. Baker.* 7 *Do.*, 62, *Smith vs. Prager.* 19 *Eng. C. L. Rep.*, 112, *Doe vs. Tyler.* 3 *H. & J.*, 172, *Ringgold vs. Tyson.* 2 *G. & J.*, 132, *Glenn vs. Von Kapff.*

2nd. Because the petitioners have offered no legal or competent testimony to show any interest in the witness. It was not competent to show by his testimony that he was executor, or that the division of the negroes was made, and the manner in which it was made.

Upon the third exception they argued that the court erred in excluding the testimony therein proposed to be offered, because, in reference to the negroes in controversy, who were of the ages of four and six years, and proved to have been incapable of working and gaining a sufficient maintenance, the testator, Collinson, had no power to manumit them under the act of 1796, ch. 67, sec. 13, which act, prior to that of 1831, ch. 281, alone conferred upon the master the power to manumit; and because the power conferred by the act of 1831, upon the master to manumit, was conditional, being by the 3rd section of that act, dependent upon the consent of the slave to be manumitted.   8 *Gill,* 319, *Spencer vs. Negro Dennis.*

The ruling of the court in the 4th exception was erroneous, because the slave, by the 4th section of the act of 1831, ch. 281, had the right to renounce the manumission; and if the slaves in controversy were too young to consent or renounce, they were bound by the election of their mother, and were consequently slaves.

The ruling in the 5th exception was also wrong, because it was competent for the defendant to show that the negroes refused to accept of the freedom given them by the will of Collinson, by *their own declarations and admissions,* and because the testator had no power to manumit them against their consent.   5 *H. & J.,* 51, *Walkup vs. Pratt.*   3 *H. & J.,* 158, *Queen vs. Neale.*

The court erred in granting the petitioners' prayer in the 6th exception.   1st. Because the testator had the power to bequeath the negroes to his legatees upon the contingency of their refusal to consent to their manumission, inasmuch as the consent of the *negroes in controversy* is, by the 3rd section of the act of 1831, which confirms the power to manumit, made a condition precedent to the vesting of the bequest of freedom; and that the master had, consequently, the power to bequeath them upon the failure of the condition upon which they were to be free.   In this view it is immaterial whether the "*consent*" required by the 3rd section of this act refers to the

manumission or to their removal from the State. In either case the *consent* is a condition precedent to the vesting of the bequest for freedom. 8 *Gill*, 321.

2nd. Because, by the act of 1831, the condition is annexed to the exercise of the power to manumit conferred by the act of 1796, requiring the removal of the manumitted slave, and the master would necessarily have the power of prescribing the very condition which is contained in that act; that the testator in this case had, consequently, since the act of 1831, the right to annex to the bequest of freedom the condition of the consent to remove. 8 *Gill*, 321. 3 *Md. Rep.*, 125, *Vansant vs. Roberts.* 1 *Gill*, 395, *Jones vs. Earle.*

3rd. Because the prayer directs the jury to find the petitioners free, though they were incapable of consenting to the bequest of freedom, and though they had refused to consent to it, and though they were incapable of working and maintaining themselves, and although their mother had exercised the privilege of refusal to accept of such bequest, and though the petitioners had never authorised the filing of said petition in their name, and wish their suit to be dismissed. Act of 1796, ch. 67, secs. 13, 29. 6 *H. & J.*, 16, *Hamilton vs. Cragg.* 8 *G. & J.*, 32, *Anderson vs. Baily.*

The court also erred in refusing the defendant's prayer in the 7th exception, because the act of 1831 does not repeal the provisions of the act of 1796, ch. 67, in so far as that act requires the negro manumitted to be capable of supporting himself. 1 *Md. Ch. Dec.*, 357, *Negro Monica vs. Mitchell.* 5 *Md. Rep.*, 139, *Wilson vs. Farquharson.*

*Henry M. Murray* and *Reverdy Johnson* for the appellees, argued the following points:

1st. That the ruling of the court in the *first* and *second* exceptions, relative to the competency of Benjamin Tongue as a witness, was correct:

1st. Because the record clearly shows that the witness was interested in the event of the suit. The petitioners, Rhody and Crissy, were, in the division of Collinson's negroes,

assigned to Mrs. Waters, who, by will, devised the residue of *her* negroes to be divided *equally in value* between the *witness and defendant.* Witness was the executor of Mrs. Waters, and in the division of her negroes *the petitioners,* with other negroes, were assigned to *defendant,* whilst others, *all slaves for life,* were assigned to *witness* as his share thereof. Thus it appears that in this division of the slaves of Mrs. Waters, made either *in pais* or by witness as executor, the defendant, who was entitled to an *equal* share thereof *in value,* received as part of his share *six-negroes,* who were entitled to their freedom under Collinson's will, and to whom therefore *Mrs. Waters* had no title whatever, whilst witness received for his share negroes, *all of whom* were slaves for life and the property of Mrs. Waters. We insist, therefore, that witness was clearly interested in proving the petitioners to *be slaves,* because if they recovered their freedom by *title paramount* that of Mrs. Waters, he would be liable to the defendant, either upon the doctrine of contribution as between co-legatees, or upon an implied warranty of title as between vendor and vendee, and in a suit against him for such contribution the judgment for freedom in this case would be *admissible in evidence.* 1 *Greenlf. on Ev.,* secs. 393, 397, 398. 6 *Geo. Rep.,* 303, *Ray vs. The Justices, &c.* 1 *Story's Eq.,* secs. 503, 505. 1 *Dessa.,* 543, *Snow vs. Callum.* 9 *G. & J.* 180, *Negro Harriet vs. Ridgely.* Ibid., 212, *Cross, et al., vs. Black.* 7 *G. & J.,* 107, *Allein vs. Sharp.* *Rawle on Cov. for Title,* 467 to 469. 8 *Humph.,* 256, 287, *Sawyers vs. Cator.* 4 *Md. Ch. Dec.,* 139, *Dugan vs. Hollins.*

2nd. Because there is nothing in the record to show that the testimony of this witness was material to the defendant's case, or that he testified to any fact which could by possibility prevent the petitioners' recovery, and the judgment therefore will not be reversed by this court, even though they may be of opinion that the ruling of the court below in these exceptions was erroneous, because the appellant has suffered no injury thereby.

2nd. The questions raised by the *third, fourth, sixth* and

*seventh* exceptions relate to the construction of the will of John Collinson, under which the petitioners claim their freedom, and of the acts of 1831, ch. 281, and 1796, ch. 67. And as to these we insist:

1st. That the condition annexed to the bequest of freedom, viz., that the manumitted slaves, in case they refuse to go to Liberia, &c., *shall be slaves,* is a condition subsequent and therefore inoperative and void, and the negroes were entitled to their freedom even if they *should refuse to leave the State.* 8 *Gill,* 314, *Spencer vs. Negro Dennis.* 3 *Md. Rep.,* 119, *Vansant vs. Roberts.*

2nd. That the restrictions contained in the act of 1796, ch. 67, in reference to *the age* at which manumitted slaves are capable of receiving freedom, and their *ability* to work and gain a maintenance and livelihood, are *repealed* by the provisions of the act of 1831, ch. 281. The object of the 13th section of the act of 1796 was to prevent negroes too young or too old to gain a "maintenance" from being thrown upon the public for support, (6 *H. & J.,* 18, 19, *Hamilton vs. Cragg,*) but this difficulty is guarded against by the 5th section of the act of 1831, by making the manumittor and his representatives liable in such cases, whilst the 3rd section gives the capacity to *all slaves of whatever age* to receive manumission. At the time of the passage of the act of 1796, the idea of colonization was not entertained by the people of the State, but *this* was the prominent motive which led to the passage of the act of 1831, and hence, in order to promote *colonization* and to get rid of the free negro population of the State, the restrictions as to age contained in the act of 1796 were removed, whilst the legislature was careful to provide against the contingency of any who might obtain permits to remain in the State from being thrown as a burden upon the public. That this is the true and proper construction of the act of 1831, is manifest not only from the sections cited, but also from the whole tenor of the act, and the various provisions contained in it.

3rd. That the *consent* spoken of in the *third* section of the act of 1831, relates to the *removal* of the manumitted slaves

from the State as provided for in said act, and not to their manumission, and neither exception in this case raises any question as to the *consent* of the petitioners to *such removal.* But whether it be consent to removal or consent to manumission, it is not a *condition precedent* upon compliance with which alone freedom *vests.* 3 *Md. Rep.*, 119, *Vansant vs. Roberts.*

4th. But even if the consent there spoken of means consent to manumission, and is a condition precedent, then it will be insisted that in the case of infants who are incapable from their tender years of either assenting or dissenting, the law will *presume their assent* until dissent is manifested by an open renunciation as provided by said act. The disability of infancy can never work a forfeiture of the infant's rights or prevent his receiving a benefit conferred upon him by law, and *freedom* has been declared to be, by the courts of this State, a "*most precious legacy.*"

5th. Again, no time is fixed by the act of 1831 at which this consent is to be given, and there is nothing in this record to show that these petitioners, after they attained the age to *elect*, ever had an opportunity afforded them to give their assent either to removal or to manumission, but on the contrary, that they do now so consent is evidenced by their petition in this case.

6th. The proceedings in the orphans court, attempted to be offered in evidence in the *fourth* exception, were properly ruled out. In the first place, they were not binding upon the negroes whose renunciation they purport to express, because they were not had before the *proper tribunal,* nor are they in the proper form, and notwithstanding these proceedings the negroes therein referred to could now, if they are alive, petition for, and would be entitled to receive, their freedom under the will of their master. If these proceedings would not be binding upon the negroes mentioned in them, *a fortiori,* would they not be binding upon these petitioners? But what is sufficient for the purposes of *this case,* is the fact that the petitioners, *Rhody* and *Crissy,* were born *before the death* of their master,

and were entitled to their freedom under his will, *individually* and *separately*, and not by or through *their mother*, and no renunciation or acts of their mother could affect their rights.

3rd. The *fifth* exception, and a part of the *second*, present the question, whether the declarations of a negro made *pending* his petition, and whilst he is in court by *his counsel asking* for his freedom, that he did not authorize the filing of his petition, and did not consent to be manumitted, are admissible upon *the trial of the issue of freedom vel non* ? We insist that these declarations were properly ruled out :

1st. Because such declarations so made in prejudice of his right to freedom, whilst the petitioner is under the absolute power and control of his master, should not, upon general principles, be admitted in any case. It would be establishing a precedent which would effectually suppress all petitions for freedom. Such declarations and admissions would be wrung from the slave by harsh and cruel treatment, or extorted from him by undue influence, or by imposition upon his ignorance or credulity. If they could be received, it would suggest to hard and severe masters a ready and easy mode of preventing their slaves from ever asserting the rights secured to them by the laws of the State.

2nd. Because the petitioners were in court by their *counsel* who represented them, and by whose acts they were bound, and any inquiry into the authority of the attornies to file the petition was not relevant or material to the issue to be tried before the jury. This question, if it could be raised at all, should have been presented at a different stage of the cause, and by a different proceeding.

LE GRAND, C. J., delivered the opinion of this court.

The correctness of the ruling of the Circuit Court in this case, depends upon the interpretation which is to be given to the act of 1831, chapter 281. The agreement of facts set out in the record, shows that two of the petitioners, Rhody and Crissy, were the slaves of John Collinson at the time of his death, and that his other personal estate was more than

sufficient to pay his debts. It is also admitted that these petitioners were manumitted by his last will, and that the other petitioners were born subsequently to his death.

The defence set up to the claim for freedom is, that at the time of the death of Collinson, the petitioners, Rhody and Crissy, were not, because of their tender age, capable of maintaining themselves, and, therefore, under the 13th section of the act of 1796, ch. 67, incapable of receiving manumission. That section provides, that no slave or slaves shall hereafter be emancipated, unless they "be under the age of forty-five years, and able to work and gain a sufficient maintenance and livelihood, at the time the freedom given shall commence."

John Collinson made his will in the year 1836, and, of course, since the passage of the act of 1831, and the question therefore is, what effect have the provisions of that act on the language of the act of 1796, which we have quoted? We are of opinion that the latter, in so far as its limitations are concerned, is repealed by the act of 1831. The 3rd section of this act declares, "*all* slaves shall be capable of receiving manumission, for the purpose of removal as aforesaid, with their consent, *of whatever age*, any law to the contrary notwithstanding." This language is broad and comprehensive, and extends to *all* slaves, no matter what may be their age. That the legislature designed to repeal the portion of the act of 1796, which we have given, is not only clear to our minds, from the language of the 3rd section of the act of 1831, but also from that of the proviso to the 5th section of the same enactment. This section, after authorizing the granting of permits for slaves to remain, declares, that "such permit shall not exempt any manumittor, or his representatives, or his estate, from any liability to maintain any hereafter emancipated slave, who, at the time his or her right to freedom accrues, may be unable to gain a livelihood, or be over forty-five years of age at the said time, and afterwards become unable to maintain himself and herself."

The limitation in the act of 1796, was evidently intended

to guard the public against the burden which would devolve upon it, if persons were permitted to manumit such of their slaves as were unable to maintain themselves. At that time the idea of colonization had not taken hold of the public mind. When, however, it came into general favor, the policy of the State was to get rid of its free colored population of all ages, and accordingly authorized the manumission of *all* slaves, irrespective of their ages. But inasmuch as the legislation on the subject contemplated that some of those who might be manumitted would desire to remain in the State, it authorized the granting of permits to that effect, guarding at the same time, however, against the possibility of the feeble and aged from falling on the public for support. We entertain no doubt that since the passage of the act of 1831, it is competent for any slaveholder to manumit his slave of whatever age, and that if he be unable to maintain himself, and does not remove out of the State, his former owner, and if dead, his representatives, are liable for his support.

We concur with the court below in regard to its ruling, as set out in each and all of the exceptions. We do not consider any *consent* to the gift of freedom necessary. The consent mentioned in the 3rd section of the act of 1831, refers to removal from the State, and not to the manumission. This being so, the court properly rejected the proposed testimony to show the petitioners were too young to give the consent to their freedom. It was a matter wholly irrelevant to the inquiry before the court. The law presumes that as freedom is a most precious legacy, those on whom it is cast do accept it, and has provided a mode how their dissent, wherever it exists, shall be evidenced by requiring it to be done in *open court*. All other modes would be liable to fraud and gross wrong on those who, in most cases, cannot be supposed to be so situated as to protect themselves against the machinations of the wily and dishonest.

It is unnecessary to inquire whether the witness, Benjamin Tongue, was competent or not. We think the court properly rejected him, because the facts *admitted* conclusively estab-

lished the right of the petitioners to freedom, and therefore it was wholly immaterial what Tongue could prove, or whether or not he was a competent witness.

*Judgment affirmed.*